**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────

**RANDY WILLIAMS,**

                              **Petitioner,**

        **v.**                                                **9:22-CV-0672**
                                                              **(MAD)**

**CHRISTOPHER YEHL,** *Superintendent,*
*Wende Correctional Facility,*

                              **Respondent.**

───────────────────────────────

**APPEARANCES:**                          **OF COUNSEL:**

**RANDY WILLIAMS**
**Petitioner pro se**
**18-B-1836**
**Wende Correctional Facility**
**P.O. Box 1187**
**Alden, NY 14004**

**HON. LETITIA JAMES**
**OFFICE OF THE NEW YORK**              **MICHELLE MAEROV, ESQ.**
**STATE ATTORNEY GENERAL**              **DANIEL HUGHES, ESQ.**
**The Capitol**
**Albany, New York 12224**
**Attorneys for Respondent**

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I.  INTRODUCTION

        Pro se petitioner Randy Williams ("Williams" or "petitioner") seeks federal habeas corpus

relief pursuant to 28 U.S.C. § 2254.  Dkt. No. 1 ("Pet.").  Respondent ("Yehl" or "respondent")

was directed to answer the petition.  Dkt. No. 6.  Respondent opposed the petition.  Dkt. No. 16

(Answer); Dkt. No. 16-1 (Memorandum of Law in Opposition); Dkt. No. 16-2 through 16-5

(State Court Records).  Petitioner has filed a traverse.  Dkt. No. 19.  For the reasons that follow,

Williams' habeas petition is denied and dismissed.

## II.  RELEVANT BACKGROUND

### A.  Indictment and Bill of Particulars

In May 2016, Williams was charged in an indictment with two counts of burglary in

the first degree, burglary in the second degree, two counts of robbery in the first degree, robbery

in the second degree, two counts of criminal use of a firearm in the first degree, two counts of

criminal use of a firearm in the second degree, criminal possession of a weapon in the third

degree and reckless driving.  Dkt. No. 16-4 at 86-88.  In the Bill of Particulars, the prosecutor

explained,  "the defendant and Martel Derby, aiding and abetting each other, knowingly entered

unlawfully into the dwelling at 208 Ash Street in the city of Syracuse with the intent to commit a

crime therein[.]"  *Id*. at 150.  The prosecution also indicated that, "the People intend to prove that

the defendant acted as both a principal and an accomplice with respect to the charges."  *Id*.

### B.  Pretrial Proceedings

From August 2016 until September 2017, petitioner, his counsel, and the prosecution

appeared, on at least twenty-three occasions, for pretrial proceedings in Onondaga County Court.

*See generally* Dkt. No. 16-2.  During that time, petitioner was assigned three different attorneys.

Dkt. No. 16-2 at 40, 53, and 78.  On April 28, 2017, July 28, 2017, September 8, 2017, and

September 13, 2017, petitioner advised the court that he wished to proceed pro se.  *Id*. at 68, 85,

96, and 171.

On September 28, 2017, the Honorable Stephen J. Judge Dougherty denied petitioner's

application to represent himself, "mainly on the grounds that Mr. Williams does not recognize the

jurisdiction of this Court but I don't believe he is prepared or in any way able to represent himself

in this case.  I think it would be a severe injustice to him if I allowed him to represent himself.  I have an extremely competent attorney of many, many years ready to try this case on behalf of Mr. Williams and that's the way I'm going to continue."  Dkt. No. 16-2 at 205.

**C.  Trial, Summation and Jury Charge**

A jury trial was held in Onondaga County Court in October 2016.  Dkt. No. 16-2 at 280-1074; Dkt. No. 16-3.  The prosecution called several witnesses including Christian Quinones ("Quinones"), Moises Navarro ("Navarro"), and Ashanti Moody ("Moody").  Quinones testified that, on April 18, 2016, at approximately 10:30 p.m., he was at 208 Ash Street when he heard a knock at the back door.  Dkt. No. 16-2 at 552.  Two people entered the residence.  *Id*. at 554. Quinones described one individual as wearing a gray sweater and jeans and holding a knife.  *Id*. The other individual was wearing a red scarf on his face and was carrying a gun.  *Id*. at 555.  The men demanded money, forced Quinones to the floor, and held him down.  *Id.* at 556.

As he was being held down, Quinones heard a voice that he recognized as his cousin, Moises Navarro.  Dkt. No. 16-2 at 557.  Quinones told Navarro, in Spanish, to get out of the house because they were being robbed.  *Id*. at 558.  The two men fled and Quinones chased after them.  *Id*.  Quinones caught up with the man who was holding the knife and struggled with him. *Id*. at 559.  Realizing that he had been cut, Quinones ran toward the house.  Dkt. No. 16-2 at 560. At that time, he realized "they were shooting at [him]."  *Id*.  Quinones returned to the residence to retrieve a gun.  *Id*.  When he went back to the driveway, he saw the men and a gunfight ensued. *Id*. at 561.  Quinones was later told that a bullet from his gun struck and killed Martel Derby.  *Id*. at 623.  Quinones did not identify petitioner at trial.  Dkt. No. 16-1 at 8, n.1.

Navarro testified that he heard his cousin say, "we're getting robbed" and left the residence.  Dkt. No. 16-2 at 631-632.  Navarro ran toward the driveway and when he turned, he

saw his cousin struggling with someone, but testified that it was not the person with the red mask. *Id*. at 633.  Navarro noticed the man with the red mask exit the back door and "see[] the same thing that I'm looking at and fires two times." *Id*.  Navarro chased him down the street and behind a strip club. *Id.* at 638.  Navarro heard a door close and saw a white Chrysler 200 "take off" with a "heavy-set person" driving.  Dkt. No. 16-2 at 638.  Navarro also saw a man "in the back crunched up." *Id*.  Navarro did not identify petitioner during the trial.  Dkt. No. 16-1 at 8, n.1.

Moody (Derby's girlfriend) testified that, at approximately 10:30 p.m., she received a telephone call from petitioner.  Dkt. No. 16-2 at 730.  Petitioner picked Moody up in a white, four door vehicle. *Id*. at 732.  Petitioner explained that Derby was shot in the stomach because they "went to hit a spot." *Id*. at 733.  Moody explained that "hit a spot" meant that they went to rob someone.  Dkt. No. 16-2 at 733.  Petitioner told Moody that "a bunch of people came yelling out in foreign languages, and [they] didn't know what they were.  They were talking crap, and then he heard gunshots go off and they took off running." *Id.* at 736.

Petitioner testified in his defense at trial.  Dkt. No. 16-2 at 957.  Petitioner stated that he drove Derby to Ash Street around 10:00 p.m. on the evening of April 18th. *Id*. at 961.  Petitioner told detectives that he was "not quite aware" that Derby was going to commit a robbery but he had "something in [his] pocket that appeared that he was going to do something." *Id*. at 962.  After he dropped Derby, petitioner drove around the block. *Id*. at 684-685.  Petitioner then heard "four or five" gunshots.  Dkt. No. 16-2 at 965.

During summation, the prosecution told the jury, "there is no doubt that [the] man armed with a knife was Martel Derby."  Dkt. No. 16-2 at 1027.  The prosecution further stated, "I don't have to speculate as to whether or not whoever was with Martel Derby - - and I'm going to submit to you it was Randy Williams in the house." *Id*. at 1031.  In support, the prosecution summarized

4

Moody's testimony and stated "the only way that Mr. Williams could relay that information to

Ashanti Moody is if he was in the house[.]"  *Id*. at 1036.  The prosecution continued:

> Now, the judge is going to instruct you on the law.  And he is going
> to instruct you on acting in concert.  And what he's going to show you
> and tell you – he's going to tell you is that, yes, you have to agree that
> these individuals were acting in concert with each other.  That they
> were helping; that they were aiding each other.
>
> And I submit to you that what the judge is going to instruct you on,
> you don't have to agree as a jury whether he was the shooter, or
> whether he was the driver of the car.  That's not what Judge
> Doughtery's going to instruct you on.  You don't have to agree on that
> part.  What you have to agree upon is that Williams [was] helping
> Martel Derby that night.

Dkt. No. 16-2 at 1038-1039.

At that point, petitioner's counsel objected to the "characterization" and stated that, "the

legal instruction you give the jury is going to tell them whether they believe he was the

accomplice or the principle, they still have to be unanimous on that.  They can't pick and choose."

Dkt. No. 16-2 at 1039.  The court overruled the objection stating it "it was a fair comment."  *Id*.

The prosecutor later stated, "[a]nd, again, we don't have to wonder whether or not the

defendant was there that night.  He tells you he drops Martel Derby off.  He tells you that.  Now,

either he dropped Martel Derby off and another individual was with him and got out of the car; or

Randy Williams got out of the car and was with him and somebody else was driving the car, but

those people arrived together." Dkt. No. 16-2 at 1051.   The prosecutor concluded, "all the

evidence supports that he was inside the house" and "even if he's the driver of the vehicle, that

still makes him guilty of the crimes, because he was acting in concert with those individuals.  *Id*.

at 1052.

During a pre-charge conference, the court provided counsel with the jury verdict sheet.

Dkt. No. 16-2 at 1062.  Counsel for petitioner conferred with his client and stated he had "no

objection to the verdict sheet[.]"  *Id*. at 1065.  The People requested an additional charge as to

accessorial liability.  *Id*. at 1066-1069.  The court rejected the request noting:

> Well, the problem you have, Mr. Petzoldt, is your Bill of Particulars.
> If in the Bill of Particulars, you wanted to argue both that he could've
> been the driver or the person that entered; that should've been pled in
> the Bill of Particulars.  I[t] wasn't.  And the Bill of Particulars is very
> clear that the People's position is that Mr. Williams went into the
> residence with Mr. Derby.  That is what is pled in the Bill of
> Particulars and that's what you're limited to.  That's – we didn't plead
> the Bill of Particulars, Mr. Coffin, the Court, no one else.  I know it
> wasn't your case at that time, but that's what you allege in the Bill of
> Particulars.  There's nothing different, and that's how Mr. Coffin has
> defended this case, so – the Court of Appeals would agree, also, that
> you're limited by what you plead in the Bill of Particulars unless
> things change and you asked to amend those, which that never
> happened.  So here we are.

Dkt. No. 16-2 at 1068-1069.

The court instructed the jury that, to find Williams guilty of burglary in the first degree,

the People were required to prove that Williams "personally, or by acting in concert with Martel

Derby, unlawfully entered in a dwelling at 208 Ash Street."  Dkt. No. 16-3 at 13, 15.  Similarly,

the court instructed that, to find Williams guilty of robbery in the first degree, the People must

prove that Williams, "personally, or by acting in concert with Martel Derby, forcibly stole

property from Christian Quinones."  *Id*. at 18.  Finally, with respect to the charge of criminal use

of a firearm, the court directed the jury that, to find Williams guilty, the People are required to

prove that Williams, "personally, or while acting in concert with Martel Derby, committed

burglary in the first degree [. . .] and displayed what appeared to be a pistol or revolver."  *Id.* at

20-21.

### D.  Verdict and Sentencing

On October 6, 2017, the jury found Williams guilty of two counts of burglary in the first

degree, two counts of robbery in the first degree, and two counts of criminal use of a fire arm. Dkt. No. 16-3 at 47-48.  Williams was acquitted of reckless driving.  *Id*. at 48.  On July 2, 2018, the court sentenced Williams to a term of incarceration of 25 years plus five years post release supervision.  *Id*. at 61.

## E. Direct Appeal

Petitioner filed a counseled brief on direct appeal to the Appellate Division, Fourth Department, in which he argued as follows: (1) the trial court erred when it allowed the prosecution to argue in summation that petitioner could be guilty of an uncharged theory; (2) the trial court erred when it declined to give a jury instruction clarifying that the jury could not find Williams guilty if he was the getaway driver; (3) the trial court erred by refusing petitioner's request to proceed pro se; (4) the trial court improperly delegated a judicial function and violated petitioner's due process and confrontation rights; and (5) the sentence of 25 years was harsh and excessive.  Dkt. No. 16-4 at 25.

The Fourth Department affirmed petitioner's conviction.  Dkt. No. 16-6 at 140.  With respect to his claim that he was found guilty of an uncharged theory, the court reasoned that, "[a]lthough the trial evidence may have supported a theory different from the one set forth in the bill of particulars-namely that defendant was a getaway driver and did not enter the residence where the robbery occurred-and although County Court erred in denying defense counsel's objection to the prosecutor's remarks during summation presenting that theory, reversal is not warranted[.]"  *Id*.  The Appellate Division found that the trial court's "charge to the jury eliminated any danger that the jury convicted defendant of an unindicted act[.]"  *Id*.

With respect to the trial court's refusal to allow petitioner to proceed pro se, the Appellate Division found that the trial court did not err.  Dkt. No. 16-4 at 140.  The court held that the trial

court, "properly denied defendant's request inasmuch as defendant engaged in a pattern of disruptive conduct meant to undermine orderly determination of the issues, arising from his mistaken belief that the court had no jurisdiction over him as a sovereign citizen[.]" *Id.* at 140-141.

Petitioner sought leave to appeal to the Court of Appeals, asking the court to consider whether the right to self-representation was properly denied and whether the errors presented in the prosecution's summation could be cured by jury instruction.  Dkt. No. 16-4 at 145.  On June 9, 2022, the Court of Appeals denied leave to appeal.  *Id.* at 157.

## III.  PETITION

Petitioner seeks habeas relief on the following grounds: (1) the trial court erred denying petitioner's request to represent himself; and (2) the prosecution presented evidence of an uncharged theory and violated petitioner's right to fair notice to prepare his criminal defense.  *See generally* Dkt. No. 1.

## IV.  DISCUSSION

**A.  Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This

standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with "clear and convincing evidence." *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)). "A state court decision is based on a

clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (internal quotation marks omitted).  Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

## B. Denial of Right to Proceed Pro Se (Ground One)

Petitioner argues that the trial court erred in denying his request to proceed pro se.  Dkt. No. 1 at 6-7; Dkt. No. 19 at 7-14.  Petitioner argues that the Appellate Division "ignored or misconstrued the trial court's denial reasoning" and, "at no time did the trial court reference any 'disruptive conduct meant to undermine, upset or unreasonably delay the progress of trial.' " Dkt. No. 19 at 10-11.

It is well-established that the Sixth Amendment grants a criminal defendant the right to represent himself at trial.  *Faretta v. California*, 422 U.S. 806, 819–21 (1975).  "The right may be exercised by all criminal defendants who knowingly, voluntarily, and unequivocally waive their right to appointed counsel." *Rush v. Lempke*, 500 Fed. App'x 12, 14 (2d Cir. 2012) (citation and internal quotation marks omitted).  "A request to proceed pro se must be unambiguous and unequivocal 'so as to inhibit[ ] any deliberate plot to manipulate the court by alternatively requesting, then waiving counsel.' " *Rivera v. Colvin*, No. 15 CV 9426, 2019 WL 2023744, at *3 (S.D.N.Y. May 8, 2019) (internal quotation marks omitted) (citing *inter alia U.S. v. Kerr*, 752 F.3d 206, 220 (2d Cir. 2014)).  The court, when presented with a request by a defendant to proceed pro se, must make the defendant "aware of the dangers and disadvantages of self-representation" and the defendant must "knowingly and intelligently forgo representation by

counsel." *Baxter v. Graham*, No. 15-CV-3197, 2021 WL 9881303, at *4 (E.D.N.Y. Aug. 18, 2021) (internal quotation marks omitted) (citation omitted), *certificate of appealability denied*, 2022 WL 18145299 (2d Cir. Mar. 2, 2022), *cert. denied*, 143 S. Ct. 612 (2023).  "Whether there has been an intelligent waiver of counsel is fact-specific and depends upon the circumstances of the case, 'including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.' "  *Gilbo v. Artus*, No. 9:10-CV-0455 (NAM), 2013 WL 160270, at *7–8 (N.D.N.Y. Jan. 15, 2013) (citations omitted).

"The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Faretta*, 422 U.S. at 834, n.46; *see also Gilbo,* 2013 WL 160270, at *7–8.  A trial court may "use willingness and ability to abide by courtroom protocol as prerequisites for accepting a defendant's waiver of his right to counsel" and may deny "self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."  *Faretta*, 422 U.S. at 834, n.46. (citing *inter alia Davis v. Grant*, 532 F.3d 132, 142, 149 (2d Cir. 2008)); *see Zimmerman v. Miller*, No. 16-CV-112, 2018 WL 11265121, at *16 (W.D.N.Y. Oct. 15, 2018) (holding that the petitioner's "conduct after his oral assertions showed his vacillation if not his complete abandonment of his request to represent himself.").  The trial judge is uniquely positioned to observe the defendant's behavior first-hand and thus, "may forbid a defendant from serving as his own lawyer when the defendant's unruly behavior at a pre-trial hearing stayed 'consistent with his behavior during other proceedings and would likely continue at trial.' "  *McKnight v. Superintendent Albauch*, No. 97 CIV. 7415, 2000 WL 1072351, at *8 (S.D.N.Y. Aug. 2, 2000) (noting that abusive remarks hurled at the judge need not be tolerated) (citations omitted).

In two district court cases, the courts were presented with similar habeas claims related to

the right to self representation.  In these cases, the state courts denied motions to proceed pro se due to the defendants' disruptive conduct.  In *Gilbo*, the trial court denied the defendant's motion to proceed pro se holding because the defendant, "refused to discuss the trial process and instead became angry and belligerent, saying that he would refuse to participate, and that the whole proceeding was a sham, and 'that you all will just do whatever you want to do.' " *Gilbo*, 2013 WL 160270, at \*5.  On appeal, the appellate court found that the trial judge properly denied the defendant's motion to proceed pro se based on his "unprovoked, disruptive conduct and his refusal to meaningfully participate in his trial[.]" *Id.* at \*8.  The appellate division noted that the defendant was belligerent during court appearances and "criticized the court over a prior ruling regarding bail, demanded a change of venue and stated that he was 'going to get railroaded, [and he] might as well get railroaded from [his] cell.' " *Id.*  On habeas review, this court found that, based upon the record, "the Appellate Division's decision, entitled to AEDPA deference, was not contrary to or an unreasonable application of, clearly established Supreme Court precedent." *Id.*

Similarly, in *Lewis v. Davis* No. CV 4:18-1049, 2019 WL 330460, at \*7–9 (S.D. Tex. Jan. 25, 2019), the state court was presented with jurisdictional challenges by a defendant seeking to proceed pro se.  In that case, the trial judge denied the defendant's application after observing, first-hand, his "confrontational and obstructive behavior." *Id.*  The court noted that while the defendant was, at times, cooperative and responsive, in several hearings, he insisted that the court addressed the wrong person and raised jurisdictional arguments. *Id.*  In some proceedings, his attorney attempted to interject, but the defendant "often in loud and disruptive outbursts" argued that he did not consent to moving forward with trial with his appointed attorney. *Lewis*, 2019 WL 330460, at \*7-9.

Upon habeas review, the district court noted that, "so-called sovereign citizens share a

common vernacular and courtroom strategy.  Courts across the country have encountered their particular brand of obstinacy — not consenting to trial, arguing over the proper format and meaning of their names, raising nonsensical challenges to subject matter jurisdiction, making irrelevant references to the Uniform Commercial Code, and referring to themselves as trustees or security interest holders." *Lewis*, 2019 WL 330460, at *7-9.  The court concluded that "[t]hese calculated obstructions and delay tactics pose a unique challenge for trial courts considering *Faretta* motions." *Id*.  The district court found that, "[t]he delay caused by appellant's questions, interjections about his proper name, and general refusal to give answers responsive to the trial court's questioning were not regular incidents of self-representation. Rather, they were deliberate and calculated disruptions." *Id*.  The district court affirmed the trial court's determination holding, "the trial court[. . .] witnessed this behavior firsthand." *Id.*

In this matter, as in *Gilbo* and *Lewis*, petitioner displayed obstructionist behavior, provided non-responsive answers to the court's questions, objected to the proceedings and the court's authority, and exhibited a general disrespect and disregard for the court and judicial process.  Judge Dougherty attempted, on at least three occasions, to conduct the appropriate *Faretta* inquiry.  However, rather than answer the questions posed, petitioner launched into speeches regarding the Uniform Commercial Code, jurisdiction, demanded an appearance bond, spoke of "corporate fiction," and expressed his clear unwillingness to comply with court orders.

To wit, on April 28, 2017, during a hearing to address issues related to DNA testing, Judge Dougherty asked petitioner if he understood the penalties for refusing to comply with court orders.  Dkt. No. 16-2 at 65.  Petitioner did not respond to the court's inquiry and asked "to be heard."  Petitioner stated:

> PETITIONER:  I'm asking that I don't get interrupted because I
> allowed you to speak so I'm going to ask you to allow me to do the

same.  You assigned Eric Sherwood to the case back in February.  I
haven't met this lawyer ever since then.  This is my first time I ever
see him.  That's one.  Number two, I want to go pro se.  Let's get that
straight.

THE COURT: That's up to me.  That's not up to you.

PETITIONER: That's my constitutional right.  You going to deny me
my constitutional right to defend myself?

Dkt. No. 16-2 at 68.

The judge cautioned petitioner that he was "facing a sentence in court that would be

basically for the rest of [his] life" and noted, "I have to make a very detailed inquiry as to whether

you're even capable of doing so."  Dkt. No. 16-2 at 68.  Petitioner began to speak over Judge

Dougherty, prompting the court reporter to intervene because she could not understand.  *Id*. at 69.

Judge Dougherty noted, "[h]ere's a good reason why you shouldn't be representing yourself [. . .]

[b]ecause no one can understand what you're saying because you're talking so fast.  The jury's not

going to be able to understand it and that will be the end of your case."  *Id.*

Despite the court's admonishment, petitioner continued:

PETITIONER: I have a superior court claim and hold in due course a
principal creditor having a registered property lien, hold all interest to
all property held in the...

THE COURT REPORTER: Sir, I can't understand you.

PETITIONER: Randy Williams, evidenced by the UCC financial
statement number 2017-03210136321.  This is a matter of public
record at the Department of State as well as been authenticated at the
Onondaga County clerk's office. Judge Dougherty, you are aware you
told me April 24 I believe that you did receive the legal notice and
demand.  From that point on I do know you and me had...

THE COURT REPORTER: I can't understand you, sir.  You're going
to have to slow down.

Dkt. No. 16-2 at 69-70.

14

Petitioner told the court that he was being falsely imprisoned and cautioned Judge Dougherty that if he continued to "move forward" and forced petitioner to comply with DNA testing that the judge would be "subjected to prosecution[.]" Dkt. No. 16-2 at 71.  The court asked petitioner if he intended to comply with court orders and when petitioner stated "absolutely not," Judge Dougherty held petitioner in contempt and sentenced him to thirty days in jail.  *Id*. at 72.

On August 30, 2017, during an appearance to schedule a date for a suppression hearing and trial, petitioner reiterated his desire to represent himself.  Dkt. No. 16-2 at 85-86.  Again, rather than engaging in a dialogue with the court as required by *Faretta*, petitioner vehemently objected to the court's "jurisdiction."   The judge warned petitioner that the issues presented during the suppression hearing "are very particular within the law" and "without a background in the law, trying to conduct a suppression hearing is next to impossible[.]"  *Id*. at 86.  Petitioner reiterated his desire to proceed pro se and, in response, the court asked, "[w]hat is the burden of proof for the People at a suppression hearing?"  *Id*. at 87.  Petitioner answered, "that doesn't apply to me" and stated, "me and my private pastor.  We're incorporating fiction here.  Let me make something clear quick. According to the Corpus Juris Volume 7, Section (4), it clearly states there that the attorney's first duty is to the court, the public, then his client.  When the duty is a conflict with the court, the former is the latter, Judge."  *Id*.

In response, the following dialogue ensued:

> THE COURT: I'm going to ask you a series of questions, and if you can answer those questions appropriately.  I've asked you one and you had no answer for it.
>
> PETITIONER: Because it doesn't apply to me, Judge Dougherty.  I don't know why we still are going back and forth with this game with you.
>
> THE COURT: Listen to me, stop talking.

> PETITIONER: No. You can't make me.  Think New York State deals
> with corporate fiction.  You know that Judge.  I will not keep playing
> these games with you.  I'm not being represented by counsel.  He don't
> speak for me.  You understand that?  I'm not making no mistake.
> Nothing.  I know what I'm doing.  You trying to play games with me
> and you can't confuse me.
>
> THE COURT: Every time you interrupt it's not on the record.
>
> PETITIONER: I wouldn't be surprised because the games you people
> play, the two of you.

Dkt. No. 16-2 at 89.

The court attempted to focus petitioner's attention on the required dialogue and asked

petitioner "[w]hat is the burden of proof at a suppression hearing for the People?"  Dkt. No. 16-2

at 89.  Petitioner responded, "[w]hy I need to know the burden of proof when the charges do not

apply to me, Judge Dougherty.  We dealing with mere corporate fiction which is what we are

dealing with, Judge[]" and asked, "how that law apply to me?"  *Id*.  The court responded, "[i]t

applies to every single defendant in New York State, Mr. Williams[.]"  *Id*. at 91.  Petitioner asked,

"[w]hat makes me a defendant" and stated, "I been charged with corporate fiction[.]"  *Id*.  The

court terminated the inquiry and adjourned the matter until September 8, 2017.  Dkt. No. 16-2 at

91.

Petitioner repeatedly refused to answer the questions posed, insisted that the law and

burden of proof did not apply to him, and demonstrated a general lack of respect toward the court

and judicial process.  Indeed, petitioner's conduct became so disruptive, that the court was forced

to remove him from the courtroom for the entirety of the suppression hearing.   On September 8,

2017, before the suppression hearing began, petitioner interrupted and reminded the court that he

intended to proceed pro se.  Dkt. No. 16-2  at 96.  Petitioner attempted to address "corpus juris

secundum" as a "body of law."  *Id*.  The court interrupted and asked, "[d]o you want to represent

yourself?" *Id*.  Petitioner responded in the affirmative.  *Id*.  For a second time, the court

attempted to ask petitioner a series of questions and stated, "if we get through those questions

okay, then we'll take about you being able to do that.  If we don't, your lawyer will represent

you."  *Id*.  The following dialogue ensued:

> PETITIONER: Well, before we answer those questions, let me just say something first. At this time, I demand an appearance bond or personal reconnaissance bond be issued forthwith and I respectfully demand a waiver of the fees and costs so I can appear and plead to the charges on behalf of my debtor at which that time - - excuse me?
>
> THE COURT: You're making no - -
>
> PETITIONER: Can I finish - -
>
> THE COURT: You're not making any sense.
>
> PETITIONER: I am making sense.
>
> THE COURT: Not to me, not to these lawyers, not to that lawyer.
>
> PETITIONER: According to Title 22 of the New York Code of Rules and Regulations under the title Part 1200, you're supposed to be an exemplar of dignity and impartiality, and so when you cut me off from speaking, I do not understand how you're being "dignit" how you're showing any dignity.  So I would say let me start again from the beginning.  I demand an appearance bond - -
>
> THE COURT: Stop. Stop. I'm going to have you removed from the courtroom if you don't stop.
>
> PETITIONER: Then you can have me removed.
>
> THE COURT: If you want to represent yourself - -
>
> PETITIONER: Yes.
>
> THE COURT: - - I need to ask you a series of questions.  I don't want to hear about appearance bonds; I don't want to hear about juris secundum.  Anything.  I want to hear about whether you are capable of representing yourself.  I'm going to ask you a series of questions - -
>
> PETITIONER: Okay, but before you ask these questions - -

17

> THE COURT: No, no.
>
> PETITIONER: Before you ask these questions, if those questions are not in accordance with *Faretta versus California*, then again, they're irrelevant because you're asking about the prosecution burden of
>
> THE COURT: No - -
>
> PETITIONER: - - of suppression - -
>
> THE COURT: You don't know what I'm asking.
>
> PETITIONER: It's irrelevant.
>
> THE COURT: I haven't asked a question yet.
>
> PETITIONER: It's irrelevant.
>
> THE COURT: Do you want me to ask you these questions?

Dkt. No. 16-2 at 97-98.

At that point, petitioner's counsel attempted to speak with him and petitioner stated, "you're fired." Dkt. No. 16-2 at 99. Judge Dougherty intervened and stated, "you don't get to make that determination" and petitioner responded, "I just did." *Id*. Petitioner continued, ". . . then you're saying that you're high and mighty Supreme Court judges and you can just make rules as you see fit?" *Id*. The court asked, pursuant to *Faretta* "and all of it's progeny, would you like me to ask these questions or not?" *Id*. at 99-100. Petitioner responded in the affirmative. *Id*. at 100.

> THE COURT: You have indicated, Mr. Williams, that you wish to proceed pro se, meaning that you wish to represent yourself. Under our law, you have the right to have a lawyer to defend you. You can waive that right, but before permitting you to give up that right and proceed as your own lawyer, I have to decide whether you fully understand the significance and consequences of doing so. In order to do that, I must ask you some questions and listen to and evaluate your answers. If you don't understand the question or you don't hear it, you let me know. Do you understand that part? Do you understand that?

PETITIONER: Yep.

THE COURT: Have you previously been a defendant in a criminal trial?

PETITIONER: When you say defendant, are you saying - - are you referring to me in my private capacity or are you referring to the corporate fiction as identified in capital letters on all court documentation?

THE COURT: Have you previously, Mr. Williams, been a defendant in a criminal trial, yes or no?

PETITIONER: Again, are you referring to me in my private capacity or are you referring to the corporate fiction as identified in the court documentation, Judge, In all capital letter names, which is not me.

THE COURT: I find that Mr. Williams is incapable of representing himself in this trial, is incapable of proceeding pro se.  He can not answer to the Court the simplest yes or no question - -

PETITIONER: Judge, under what jurisdiction - -

THE COURT: Mr. Williams - -

PETITIONER: Under what constitution are you claiming - -

THE COURT: Here's what - -

PETITIONER: Under what jurisdiction are you claiming star charter - - star chambers jurisdiction by - - by about - - what part of the constitution do you claim your star chambers jurisdiction to be on American soil?

THE COURT: Here's what we're going to do, Mr. Williams.

PETITIONER: Can you answer the question?

THE COURT: You're going to have a seat and be quiet during the hearing - -

PETITIONER: Can you answer the question?

THE COURT: If not, you're going to be removed.

PETITIONER: Well, you have no jurisdiction, Judge, so I don't

understand how you're still proceeding.

THE COURT: Mr. Williams, do you want to sit down and be quiet or do you want to leave?

PETITIONER: But you have no jurisdiction.

THE COURT: You know what - -

PETITIONER: You have no jurisdiction, so will you answer my question then?

THE COURT: I'm going to.

PETITIONER: I answered your question.  You answer my question.
THE COURT: You did not answer my question.

PETITIONER: I just did.

THE COURT: You're wrong.  I have jurisdiction.

PETITIONER: How?

THE COURT: You're wrong.  What you're saying is wrong.  Everything you have said this afternoon is wrong.

PETITIONER: I can prove you don't got jurisdiction.  Can you prove you do?

THE COURT: Do you want to sit down?

PETITIONER: Yes or no?

THE COURT: Would you like to be here for your hearing?

PETITIONER: I can prove that you don't got jurisdiction.  Can you prove that you do?

THE COURT: Please remove him.

Dkt. No. 16-2 at 100-103.

Finally, on September 13, 2017, petitioner renewed his request to proceed pro se and

claimed he was prepared to engage in the colloquy that the court attempted to conduct during the

prior appearance.  Dkt. No. 16-2 at 176.  The court stated, "if you want to represent yourself, we're going to do things my way, not your way.  You have to recognize the jurisdiction of this court over you" and advised, "[i]f you don't recognize the jurisdiction of the court over you, how can I let you represent yourself?"  *Id*.  Again, petitioner provided non-responsive answers and stated,  "[a]gain, we can go through the questions as far as the fact that the Constitution grants the Court two forms of jurisdiction.  One under Common Law and one under Admiralty Law or Military Tribunal under Article 1, Section 8, Claus 17 of the Constitution.  So under which jurisdiction would the Court be trying me under?"  Dkt. No. 16-2 at 177.

The record before this Court supports the conclusion that petitioner "forfeited any right to self-representation" by his conduct and general unwillingness to abide by courtroom protocol.  *See Jones v. Murphy*, No. 3:10-CV-49, 2010 WL 3829129, at *11 (D. Conn. Sept. 21, 2010), *aff'd*, 694 F.3d 225 (2d Cir. 2012); *see Clark v. Perez*, 510 F.3d 382, 395 (2d Cir. 2008) ("The trial judge acted appropriately in denying the petitioner's request to proceed pro se as the petitioner deliberately engaged "in serious and obstructionist misconduct" and repeatedly demonstrated that he was not "able and willing to abide by rules of procedure and courtroom protocol.");  *see also Zimmerman*, 2018 WL 11265121, at *15 (reasoning that the petitioner "repeatedly rebuffed" the attempt to conduct a *Faretta* inquiry and "made it clear that he was not interested in going through such a colloquy.").  As in *Lewis*, the trial judge observed petitioner's disruptive conduct, first hand, on several occasions.  Petitioner was consistently argumentative, disrespectful to the court and his counsel, and insisted that the court did not have jurisdiction.  From the record, this Court is confident that had Williams been permitted to proceed pro se, the trial would have been unreasonably delayed by his conduct.

Although petitioner takes issue with the Appellate Division's interpretation of the trial

court's ruling, he has not satisfied his burden to show that the Appellate Division's conclusion is contrary to or an unreasonable application of clearly established precedent.  *See Skinner v. Dir., Texas Dep't of Crim. Just., Corr. Institutions Div.*, No. 3:21-CV-1246, 2023 WL 5338157, at *5 (N.D. Tex. July 31, 2023), *report and recommendation adopted*, 2023 WL 5333275 (N.D. Tex. Aug. 18, 2023); *Felder v. Ohio Adult Parole Auth.*, No. 1:07 CV 1535, 2009 WL 3763067, at *20 (N.D. Ohio Nov. 9, 2009) (rejecting the petitioner's argument that the appellate court misconstrued the record because the petitioner had "not identified any clearly established federal law supporting his claim that an appellate court's inaccurate citations to the record, even when considered cumulatively, violates a petitioner's federal constitutional rights.").

Therefore, Ground One is denied and dismissed.

## C.  Uncharged Theory (Ground Two)

Petitioner claims that the prosecution presented an uncharged theory of liability during the summation and violated his right to fair notice to prepare for his criminal defense and deprived him of due process.  Dkt. No. 1 at 9-11; Dkt. No. 19 at 15.

Petitioner's argument that the prosecution's summation presented an uncharged theory depriving him of fair notice to prepare a defense does not present a federal claim.  *See DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004) (holding that the petitioner's claim that the State's summation, while consistent with the indictment, deviated from its bill of particulars, does not present a federal claim);  *Garson v. Perlman*, 541 F.Supp.2d 515, 522 (E.D.N.Y. 2008) (dismissing the petitioner's claim that "the prosecutor's arguments in opening and closing exceeded the theory disclosed in the Bill of Particulars" as not cognizable on federal habeas corpus review); *Nunez v. Danforth*, No. 20 CIV 10230, 2022 WL 18027567, at *4 (S.D.N.Y. Dec. 30, 2022) (holding that the "assertion[] that the prosecutor or the court illegally amended the

indictment and changed the theory of prosecution are not a basis for federal habeas relief under the Fourteenth Amendment.").

Even assuming, as the Appellate Division held, that the county court erred in denying defense counsel's objection to the prosecutor's remarks during summation presenting a new theory, petitioner's argument still lacks merit.  Upon review of the transcript of the summation and jury charge, this Court concludes that petitioner cannot establish that his constitutional rights were violated.  The judge instructed the jury that the People were required to prove that Williams "personally, or by acting in concert with Martel Derby, unlawfully entered in a dwelling at 208 Ash Street."  Dkt. No. 16-3 at 13, 15.  Similarly, the court instructed that, to find Williams guilty of robbery in the first degree, the People must prove that Williams, "personally, or by acting in concert with Martel Derby, forcibly stole property from Christian Quinones."  *Id*. at 18.  Finally, with respect to the charge of criminal use of a firearm, the court directed the jury that, to find Williams guilty, the People were required to prove that Williams, "personally, or while acting in concert with Martel Derby, committed burglary in the first degree [. . .] and displayed what appeared to be a pistol or revolver."  *Id*. at 20-21.  Importantly, the law presumes the jury obeyed the trial court's instruction.  *Weeks v. Angelone*, 528 U.S. 225, 226 (2000).  Accordingly, petitioner only speculates that he was convicted of an uncharged theory.  *See Epps v. Poole*, No. 07 CV 3432, 2010 WL 1991517, at *9 (E.D.N.Y. May 14, 2010) (reasoning that, because the trial court's jury instructions permitted the jury to consider only the crime of depraved indifference murder, not intentional murder, the jury was "specifically told that petitioner was not charged with intentionally causing [. . .] death") (citations omitted) *aff'd*, 687 F.3d 46 (2d Cir. 2012), *as amended* (Aug. 9, 2012).

Accordingly, Ground 2 is denied and dismissed.

## V. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the petition (Dkt. No. 1) is **DENIED AND DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[1] and it is further

**ORDERED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

Dated: December 1, 2023
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[1] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation" (emphasis in original)).